MILLS COUNTY v. BROWN COUNTY.

No. 1293.

1. **New Counties—Liability for Share of Debts of Old County.**—The opinion of the Supreme Court (87 Texas, 475), on questions certified in this case set out and followed. The Constitution and legislation upon the liability of new counties for proportional share of debts of the counties from which the new are taken are discussed. The discussion is based upon the claim of Brown County against Mills County for the proportion of the debts of Brown County, which the assessed values of that part of Brown County included in Mills County bore to the assessed values of the part remaining. The new county is liable in proportion of the excised territory to that remaining. Acts 23rd Leg., chap. 93, p. 124.

2. **Res Adjudicata—Dismissal.**—The dismissal of a suit is not res adjudicata. It leaves the controversy just as if no action had been commenced.

APPEAL from Brown.   Tried below before Hon. J. O. WOODWARD.

*Triplett & Doughty* and *Lewis & Anderson*, for appellant.

*H. H. Moore* and *Bell & Bell*, for appellee.

FISHER, CHIEF JUSTICE.—This is an action by Brown County against Mills County to recover the pro rata share of the indebtedness of Brown County due by Mills County as a part of the severed territory of Brown County under the Act of the Twenty-third Legislature, page 124.   Judgment below was rendered in favor of Brown County.

*Findings of Facts.*—We find the following as the facts in the case:

1.   That Brown County was created and organized in 1858.

2.   Mills County was created and organized in 1887 out of territory taken from Brown, Hamilton, Comanche, and Lampasas Counties.

3.   The territory taken from Brown County in the formation of Mills County is comprised within the following metes and bounds, to wit:   Beginning at the southeast corner of the Richard Blevins survey, on the Colorado River; thence in a direct line to the southeast corner of survey number 1, Sulphur Fork Iron Works; thence easterly to the south line of the E. Yarbo survey 1550 varas west of the southeast corner; thence north 82° east to the line between Brown and Comanche Counties north 32° east 110 varas from the southeast corner of the T. H. Cox survey and the northeast corner of the Tunnage survey; thence south 30° east with the line heretofore existing and established between Brown and Comanche Counties and between Brown and Hamilton Counties to the northeast corner of Lampasas County and the southeast corner of Brown County, as said line and corner existed and were established at and before the creation of Mills County; thence west with the line between Brown and Lampasas Counties, as it existed at and prior to the creation of Mills County, to the Colorado River, at the mouth of the Pecan Bayou; thence up said Colorado River with its meanders to the place of beginning, containing 308 square miles, and at the time of the creation of Mills County contained property the total taxable value of which was $760,817.

4.   Just prior to and at the time of the creation of Mills County, and before the severance of the above described territory, the total taxable value of all property in Brown County was $4,370,022, and after the excision of the aforesaid territory to form part of Mills County, the total taxable value of all property remaining in Brown County was $3,376,205.

5.   At the time of the creation and organization of Mills County, Brow County was justly indebted in the aggregate sum of $61,899.50.

6.   That of said indebtedness with interest, as calculated by the auditor, which is admitted to be correct, estimated according to the taxable values taken from Brown County at the creation of Mills, and

the taxable values remaining to Brown would give the ratio found by the court of $17,694.73.

7. That all said indebtedness had been paid by Brown County prior to the institution of this suit.

8. That $9000 of the amount claimed by Brown from Mills was paid by Brown with money raised by taxation, and $8764.73 was paid by Brown County with money borrowed on funding bonds issued by Brown County, in November, 1889, for the purpose of paying said indebtedness.

9. At the time of the organization of Mills County, the items and amounts of the indebtedness of Brown County were as follows:

On court house bonds issued for the purpose of building
    court house . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $43,500.00
Bridge bonds outstanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,500.00
G. R. Huston, for assessing tax for 1887 . . . . . . . . . . . . . . . . . 511.73
First class, or jury fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,924.50
Third class, or general fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,443.27
    Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $61,879.50

On which interest accrued as calculated.

10. That the court house for the erection of which the bonds were issued, at the time Mills County was created, was retained by Brown County, and is now the court house of Brown County, and at the time of the creation of Mills County was of the value of $50,000.

11. That the bridges for which a bonded indebtedness was created were not cut off in the territory taken in the creation of Mills County, but were retained and are in Brown County, and are of the value of $15,000.

12. That the claim of Brown County against Mills County for its pro rata share of the indebtedness of Brown County was presented to the Commissioners Court of Mills County at its February Term, 1889, and said court then refused to allow or audit the same.

13. That on the 4th of March, 1889, Brown County filed suit in the District Court of Mills County against Mills County, and in said court in said cause, which was on the docket of said court number 17, on the 16th day of September, 1889, filed plaintiff's first amended original petition, which was between the same parties and for the same cause of action as in this cause, and that defendant, Mills County, filed answer, joining issue on law and facts, and that there was a final judgment rendered in said cause number 47 in the District Court of Mills County at its September Term, 1889, in favor of Brown County and against Mills County. That Mills County appealed said case to the Supreme Court of Texas, and on the 21st day of June, 1892, said court entered judgment reversing and dismissing the same. A motion for a rehearing was filed by Brown County in said Supreme Court, and said motion was by said Supreme Court transferred to the Court

of Civil Appeals, and said Court of Civil Appeals overruled said motion. That on the 13th day of March, 1894, the mandate issued out of the said Court of Civil Appeals, Third Supreme Judicial District of Texas, with copies of the judgment of the Supreme Court and the said Court of Civil Appeals, which was filed in the District Court of Mills County on March 16, 1894, said court being then in session at its regular March Term, 1894. That the court ordered said cause dismissed in accordance with mandate and decree of the Supreme Court. That said order was entered on the docket of the court, but was not entered in the minutes of said court, and that there is now a motion pending to have said order of dismissal entered nunc pro tunc at the September Term, 1894, of said court. In connection with this argument, the plea of lis pendens and res adjudicata in defendant's answer is hereby referred to as explanatory.

14. The journals of the House of Representatives and the Senate, Twenty-third Legislature, show that the Act of the Twenty-third Legislature of Texas, page 124, chapter 96, entitled "An act to provide for the payment by new counties of their proportionate share of the indebtedness of the older counties from which they were created," did not upon its passage by said Twenty-third Legislature receive a two-third vote of each house of the said Legislature taken by yeas and nays entered upon the journals.

15. Brown County authorized bringing this suit.

16. That Mills County since its organization has incurred a bonded indebtedness of $32,500, of which $1000 for jail, $24,500 for court house, and $7000 for bridge.

*Conclusions of Law.*—All the main points in the case were covered by questions certified from this court to the Supreme Court, which they have answered as follows:

"1. The first section of the act in question provides, in effect, when any county has been created or may hereafter be created out of any other county or counties, its proportion of the indebtedness of the old county existing at the time of its creation shall be the same as its taxable values at the time bears to the taxable values of the parent county; that a suit may be brought to recover the same in the District Court of either county, and that the court shall have power to make any order necessary to enforce its judgment. The second section provides, that the assessment rolls of the original county for the year in which the new county was created shall be conclusive evidence of the value of the taxable property in the respective counties, unless assessment rolls for the newly organized county shall have been made out in the same year, in which event the latter shall be the evidence of the taxable values of that county. Section third provides, that suits brought under the act shall have precedence in the courts, and in case of a recovery by the plaintiff, makes it the duty of the Commissioners Court of the new county to levy a tax for the payment of

the judgment.  The fourth section contains merely a declaration of emergency, for the purpose of suspending the rule, and of putting the act in force from the time of its passage.  These provisions all relate to one subject matter, and we are of opinion that that subject is sufficiently expressed in the title, which reads as follows:  'An act to provide for the payment by new counties of their proportionate share of the indebtedness of the older counties from which they were created.'  The contention seems to be, that the words 'new counties' indicate a purpose to embrace within the provisions of the act only such counties as should be created after the law had taken effect, and therefore that the title is not brought enough under section 35 of article 3 of the Constitution to warrant the Legislature in making the act applicable to counties which had been created before its passage.  But to this proposition we do not assent.  As was suggested in the argument, 'new' is a relative term.  We have a striking illustration of this fact in case of the holy scriptures.  The canonical books which appeared upon the advent of the Christian era, though now nearly twenty centuries old, are known in groups as 'the new testament,' in contradistinction to the former canonical books, which are known together as 'the old testament.'  A county which has been taken from another, whatever its age, may properly be called a new county with reference to such other.  We think the law valid, that it embraces within its provisions Mills County, and that it confers jurisdiction over the controversy upon the District Court of Brown County.

"2.  We are clearly of the opinion that the act in question is authorized by section 1 of article 9 of the Constitution of this State.

"3.  That provision in the section of the Constitution mentioned in' the question here propounded reads as follows:  'When any part of a county is stricken off and attached to or created into another county, the part stricken off shall be holden for and obliged to pay its proportion of all the liabilities then existing of the county from which it was taken, in such manner as may be prescribed by law.'  This language is definite in its terms, and leaves no room for construction.  It makes it the imperative duty of the Legislature to provide a method by which a new county may be forced to pay its proportionate part of the indebtedness of the old, existing at the time of its creation.  'All the liabilities' definitely comprehend the whole, and preclude the idea that any abatement or equitable adjustment between the two counties was contemplated.  Besides, there is not a word in the entire section which even tends to evidence a different intention.  We conclude, that the Legislature in passing the act in question acted in strict pursuance of the constitutional provision which has been quoted; and that it was not authorized to allow the new counties credit for their proportionate share of the value of the public property belonging to the present counties.

"4.  We think the act in question is constitutional.  If it be conceded that the provision quoted from section 1 of article 9 would be

in conflict with section 1 of article 8, which declares, that 'taxation shall be equal and uniform,' it does not follow that provision is inoperative. Being parts of the same instrument, both provisions must stand; and the provision which makes a new county liable for a part of the indebtedness of the county from which it was created, being special in character, should operate as an exception limiting the scope of the general provision in regard to uniformity of taxation.

"5. We are of opinion that it did not require a two-thirds vote of each house of the Legislature to give validity to the act. In order to create a new county from an old of a less area than 900 square miles, or to reduce the area of an existing county below that limit, a two-thirds vote is demanded; but no such limitation is imposed in reference to prescribing the manner of enforcing the liability of a new county for its proportionate part of the debts of the old.

"6. The effect of the decision in Mills County v. Brown County, 85 Texas, 391, is to hold, that what should be a proportionate share of the liabilities was not a legislative question. But we deem this unimportant. The opinion in that case lays down the rule by which the share shall be determined, and the Legislature in the act in question has announced the same rule. So, however we may look at it, it was not error for the court to refuse to allow Mills County credit for its proportionate part of the value of the court house, jails, and public bridges belonging to Brown County.

"7. We think the Legislature did not exhaust its authority to legislate upon the subject by the passage of the Act of March 15, 1887, which was declared unconstitutional in the case cited above, between these same parties.

"8. The Legislature never having prescribed by a valid act the manner in which Mills County should be obliged to pay its part of the debts of Brown County, the latter was unable to bring a suit to enforce the obligation, and therefore the statute of limitation did not begin to run against it until the passage of the law in question.

"9. The act in question prescribes, that 'if the plaintiff shall recover, it shall be the duty of the Commissioners Court of the newly created county to levy a special tax on all property in the territory taken from the plaintiff county sufficient to pay off the judgment, and if the first levy be insufficient, to make said levy annually till the judgment is satisfied; and the judgment of the court shall order said Commissioners Court to make such levies.' This provision expressly confers authority upon the court in which the judgment is rendered to make the order for the levy of the tax; and we see no good reason to doubt the validity of the provision.

"If the question be as to the power of the court to direct the levy to be made upon that part of the new county which was taken from the old, we answer that the provision just quoted in effect provides that the levy shall be so ordered, and that the provision formerly quoted from section 1 of article 9 of the Constitution, expressly de-

clares, that it is 'the part stricken off' that 'shall be holden for and obliged to pay its proportion' of the liabilities of the old county."

The previous suit between the counties was not res adjudicata, and did not estop Brown County in maintaining the present action, because that suit was by order of the Supreme Court dismissed. The judgment rendered by the Supreme Court was in effect a dismissal of the previous suit. A dismissal of a suit is not res adjudicata. It leaves the controversy just as if no action had been commenced.

The judgment is affirmed.

*Affirmed.*

Delivered April 10, 1895.